640 So.2d 406 (1994)
Mary FANARA
v.
Charles J. CANDELLA, et al.
No. 94-491.
Court of Appeal of Louisiana, Third Circuit.
April 18, 1994.
Writ Denied April 21, 1994.
*407 J. Michael Chamblee, Gold, Weems, Bruser, Sues & Rundell, Alexandria, LA, for Mary Fanara.
Carol James Aymond Jr., Bunkie, for Charles J. Candella et al.
Before DOUCET, YELVERTON and COOKS, JJ.
DOUCET, Judge.
This is an election suit by Mary Fanara, an unsuccessful candidate for the office of Chief of Police for the City of Bunkie.
On March 26, 1994, an election was held in the City of Bunkie, Parish of Avoyelles, for among other offices, Chief of Police. Candidates were incumbent Charles Candella and Mary Fanara. Charles Candella received 1,005 votes while Mary Fanara received 1,003 votes.
Mary Fanara contested the election by filing suit in the Twelfth Judicial Court, Parish of Avoyelles. The trial was heard on April 8, 1994. The trial court after disqualifying 18 of the votes cast, found that the results of the March 26 election for Chief of Police of Bunkie was impossible to determine *408 and declared the election void and ordered a new election. The court assessed 50% of the costs to each of the parties. Chief Charles Candella timely appealed. The trial court signed the motion and set a $1000 bond to cover the payment of the court costs. The appellant's attorney signed a check for $1000 and deposited it with the clerk's office.
The appeal was lodged with this court on April 14, 1994. Prior to the lodging of the appeal, plaintiff-appellee filed a motion to dismiss alleging that the bond was untimely filed. The defendant-appellee also filed an answer asking this court to declare the plaintiff the winner of the election, as well as arguing that the trial court erred in holding plaintiff accountable for one-half of the court costs.

MOTION TO DISMISS
R.S. 18:1409(D) states as follows:
D. Within twenty-four hours after rendition of judgment, a party aggrieved by the judgment may appeal by obtaining an order of appeal and giving bond for a sum fixed by the court to secure the payment of costs. The clerk of the trial court shall give notice of the order of appeal to the clerk of the court of appeal and to all the parties or their counsel of record. The trial judge shall fix the return day at a time not to exceed five days after rendition of judgment.
Generally, an appellant is required to pay the estimated costs of preparing the appeal in advance of the lodging of the appeal. See C.C.P. article 2126. Due to the time restraints for appealing an election suit, R.S. 18:1409 requires that the appellant give bond for a sum fixed by the court to secure the payment of the costs. This provision is for the benefit of the clerk of court.
In the present case, the appellant filed his appeal on April 10, 1994. The judge signed an order setting bond in the amount of $1000. The appellant's attorney deposited with the clerk a personal check in the amount of $1000 to be applied to the payment of the appeal costs. This court finds that the payment of the court costs in lieu of filing a bond for the accrual of court costs is sufficient. The payment of the estimated costs to the clerk is authorized by C.C.P. article 2126. We therefore deny appellee's motion to dismiss.

ON THE MERITS
The issue presented by this appeal is whether the trial court erred in determining that it was impossible to determine the results of the election due to election improprieties. In arriving at this determination, the trial court found that two voters who had voted in the election were not eligible to vote and that seventeen voters received unauthorized assistance in voting in the election. The trial court's excellent reasons for judgment are attached as an appendix to this opinion.
The trial court found that Norman Fillingame had moved from his William Street residence in September or October of 1993 and failed to change his registration. The trial court concluded he was not eligible to vote in the election citing R.S. 18:110(B)(2).
The record reveals that Norman Fillingame's vote was properly challenged at the poll on election day in compliance with the procedure provided by R.S. 18:565. We find that the trial court properly voided his vote as illegal.
The record also supports the trial court's conclusion that Mr. Lawrence Thomason, who voted in Ward 10 Precinct 5 on March 26, 1994, was not qualified to vote. The evidence showed that there was only one Lawrence Thomason or Lawrence Thompson registered in that precinct to vote. The arrest records of Lawrence Jackie Thompson and the voting record of Lawrence Lee Thomason revealed that each individual had the same birth date and the social security number was only different by one digit in these two documents. The voting record showed Lawrence Thomason's mother's maiden name as Thompson.
We find no error in the trial court's conclusion that Mr. Lawrence Thomason, who voted in the election, was the same Lawrence Thompson that pled guilty to the *409 offense of second degree battery on May 7, 1991, and was under supervised probation for a period of three years. The trial court properly concluded that under R.S. 18:102 Mr. Thomason should not have been permitted to vote since he was under an order of imprisonment.
The evidence in the record also supports the trial court's conclusion that Mary Fanara did not waive her right to object to the vote of Mr. Thomason by failing to challenge the voter at the poll. We conclude, as the trial court did, that the checking of the voter registration rolls would not have shown that Lawrence Thomason was under a sentence of imprisonment, and that due diligence does not require a candidate to research every registered voter to determine whether they are under a felony sentence of conviction. There was an insufficient showing that Mary Fanara had knowledge of the felony sentence prior to the election.
In determining whether the trial court erred in finding that seventeen persons voted with improper assistance in voting, R.S. 18:564 states as follows:
§ 564. Assistance in voting
A. Voters entitled to assistance. A voter shall not receive assistance in voting unless he is unable to read, or is unable to vote without assistance because of a physical handicap, including blindness.
Amended by Acts 1989, No. 179, § 1, eff. Jan. 1, 1990.
B. Persons prohibited from assisting voters.
(1) No candidate in any election shall assist any voter in casting his ballot in that election.
(2) No commissioner-in-charge can assist a voter.
(3) No employer or employer's agent can assist an employee in voting.
(4) No union agent can assist a union member in voting.
(5) Except as provided in Paragraphs (1) through (4) of this Subsection, a voter entitled to assistance in voting may receive the assistance of any person of his choice, including a commissioner.
C. Procedure when voter receives assistance. The person or commissioners assisting the voter shall enter the voting machine with the voter and assist him in voting. No other person shall enter the voting machine or assist the voter in voting. No person selected by the voter to assist him shall reveal the name of any person for whom the voter has voted, any proposition upon which he voted, or anything that took place while the voter was being assisted.
D. (1) Prior to receiving assistance under this Section, the voter shall file with the registrar in person or by mail a statement setting forth the necessity and reasons for this assistance and shall furnish a certificate of a medical doctor or optometrist certifying to the irremediable nature of the physical handicap as proof of disability. The registrar shall indicate such facts on the voter's original application for registration, on the voting certificate, and on any other official registration records. Thereafter, the voter shall not be required to present evidence of any kind at the polls.
(2) A voter shall also be entitled to assistance without having filed with the registrar a statement setting forth the necessity and reasons for this assistance if, on election day, the voter presents to the commissioner-in-charge a physician's certificate indicating the voter's inability to vote without assistance because of a physical handicap. The commissioner-in-charge shall attach this certificate to the precinct register.
Amended by Acts 1987, No. 831, § 1, eff. Jan. 1, 1988; Acts 1991, No. 201, § 1, eff. July 15, 1991; Acts 1993, No. 418, § 1, eff. Jan. 1, 1994.
E. A voter who is visibly handicapped, and the person who will be assisting him in voting, shall be allowed to go to the front of the line to cast a ballot at the polls or when absentee voting in person.
The record clearly shows that seventeen voters were allowed to be assisted in voting in violation of R.S. 18:564. The evidence reveals that Mrs. Hattie Warner, Clerk of the City Court of Bunkie, was at *410 Precinct 4 as a watcher designated by Mary Fanara for the March 26, 1994 election. Her testimony revealed that she observed 27 voters receive assistance by others in voting. She kept a detailed written account of these observations. Her testimony revealed that she questioned the commissioners on at least two occasions as to this procedure. She was informed that the voter was entitled to assistance because they were either elderly or a first time voter. Although the commissioner in charge of the precinct testified that persons were allowed to go in with first time voters, she received no formal complaints or challenges as to this procedure. However, Vanessa Dotson, another commissioner of this precinct, testified that she did hear Hattie Warner question the procedure of allowing assistance by others in the booth. We find that the trial court was correct in its determination that Hattie Warner did question the procedure on at least two occasions.
Lonnie Juneau, the Registrar of Voters of Avoyelles Parish stated that it is more or less a custom to help the elderly with assistance in voting even though they did not have an H or an I behind their name on the voter registration. This evidence of "custom" was disputed by testimony that the Clerk of Court, Samuel Couvillon, conducted a commissioner's meeting where he instructed the commissioners on the proper procedure of allowing assistance during voting. This court finds that the procedure employed by the commissioners in Ward 10 Precinct 4 on March 26, 1994 in assisting voters not legally entitled to assistance under R.S. 18:564, even if the custom of the parish, was improper.
The trial court correctly found that Mrs. Warner's questioning of the procedure in at least two instances was an objection at the poll in accordance with R.S. 18:1434. We find that these two objections as to the procedure being employed by the commissioners was sufficient to apply to each of the seventeen voters improperly assisted, since the commissioners advised Warner that such assistance for the elderly and first time voters was proper, and further objections would have been futile.
The trial court correctly concluded that the unauthorized assistance of seventeen voters in addition to the two votes found to be void rendered the outcome of the election impossible to determine.
The plaintiff-appellee filed an answer to the appeal seeking this court to declare plaintiff the winner of the election and to cast the defendant accountable for all court costs incurred in the court below.
This court has already determined that the trial court was correct in determining that it was impossible to determine the results of the election, therefore a new election was properly ordered. We also find no abuse of discretion of the trial court in assessing one-half the court costs to each party.
For the reasons assigned, the judgment of the trial court is affirmed. Costs of the appeal assessed to appellant.
AFFIRMED.

APPENDIX
BY THE COURT:
The court will reconvene in its civil jurisdiction in the matter of # 94-0325, Mary Fanara v. Charles J. Candella, et als. The record will reflect that at 12:30 PM on April 9th, the court recessed with the understanding that the reasons for judgment would be compiled and announced, originally, for 2:00 o'clock. That was insufficient time, and the court sent word for 3:00 o'clock. I apologize for the inconvenience I may have caused.
Ladies and gentlemen, this is an extremely difficult case, both, for the attorneys and for the court. Election contests are judges' nightmares. And, we would, certainly, prefer to not have them. I can't complain, because I asked to be elected to this office. But, I can truthfully say that election contests, and, particularly, those in which the parties are friends of the court, are not pleasant to handle.
In an election contest, under the provisions of LRS 18:1401, et seq., the law requires, under the provisions of 18:1409 that:
".. the court shall render judgment within 24 hours after the case is submitted for decision."
*411 Since tomorrow is Sunday, I consider it would be in everyone's best interest to render a decision today.
There is not sufficient time to prepare a detailed and articulate opinion setting forth the reasons for judgment. The reasons for judgment will be recited orally, and I will attempt to explain these reasons, in order for the parties to understand them, and in the event of appeal, which I fully expect, for the Court of Appeal to know. And, that is the reason for setting forth the findings of facts and conclusions of law.
At the outset, I will list the principal statutory provisions which were considered, and the jurisprudence, which the court considers relevant, in reaching this decision.
This is not necessarily all the laws and cases considered, but the primary ones:
RS 18:2, 18:102; 18:110; 18:564; 18:565; 18:1401; 18:1409; 18:1431; 18:1432; 18:1434; 18:1461 and 18:1462.
The principal jurisprudence considered by a court, Davis v. McGlothin, 524 So2d, 1320; Dumas v. Jetson, 462 So2d, 266; Veuleman v. O'Con, 417 So2d, 131; Paul v. Robicheaux, 370 So2d, 588; Meyer v. Keller, 376 So2d, 636; Ingram v. Seal, 445 So2d, 3; Garrison v. Connick, 291 So2d, 778; Burford v. Sanders, 520 So2d, 993; Fontenot v. Lee, 348 So2d, 760; Moreau v. Tonry, 339 So2d, 3; and Staton v. Hutchinson, 370 So2d, 106.
Particular statutes and cases will be discussed in detail during the course of the discussion.
There are several matters to be decided, and I will attempt to discuss each. First, I'm going to discuss the vote of Norman Fillingame. Norman Fillingame resided in Bunkie at one time, and moved away in September or October of 1993. Prior to leaving Bunkie he lived on William Street in Precinct 2 of Ward 10. There is contradictory evidence as to whether he ever lived in Mississippi, or whether he moved to the Big Bend Community of Avoyelles Parish, or, perhaps, did not leave Bunkie at all. Those decisions are not decisions as to whether he went to Big Bend, directly, or Mississippi first. That is not really important, however, because the evidence clearly shows that he moved out of Bunkie no later than October of 1993. He testified at trial that since sometime in December of 1993, he had been, part of the time, with a friend on Orange Street in Bunkie, and part of the time with his former wife in Big Bend. Although he testified that he spent about three days a week at the Big Bend residence, the evidence suggests, very strongly, that he was there much more than that. His former wife, in fact, testified that he came there, everyday, to take the children to school. The evidence is very clear, to me, that, at least, at one time, he considered Big Bend his home, and even invited at least one friend to visit, what he referred to as, his new home in Big Bend.
His testimony about living part time with a friend on Orange Street is not convincing. He admitted that he kept no clothes or furniture at the friend's house; and that he kept all his clothes in the trunk of his car. He said that the friend he was living with was Ed Cullen. Ed Cullen was not called to testify as a witness. But, even if he had moved to the Orange Street residence, from Big Bend, that residence is in Precinct 3; and he was permitted to vote in this election in a different Precinct, in spite of a formal challenge of his qualifications, under RS 18:565.
There is no assertion by either the defendant, Candella, or by Fillingame, himself, that he resided in Precinct 4 after October of 1993.
The applicable statute relating to his qualifications, is 18:110B(2) provides:
"The change of residence of a registrant from one precinct to another in the same parish does not deprive him of the right to remain as a legal registrant, as to all issues upon which he was entitled to vote prior to his change of residence, in the precinct from which he was removed until he changes his registration as provided in Subsection A of this Section and has the right to vote in the precinct to which he has moved or until three months after he has moved, whichever is sooner."
Since he did not change his registration, after leaving the Williams Street residence in September or October of 1993, he lost the *412 right to vote in Precinct 4, in January of 1994, at the latest, and, probably, earlier than that.
Defendant Candella argues that Plaintiff was required to challenge Fillingame's vote prior to the election. That argument is without merit. Revised Statutes 18:565 specifically allows a challenge at the polls on election day, as to the voter's qualifications to vote. The procedure required in that statute was fully complied with, and a copy of the written challenge, which was in the election records of the parish, was offered and admitted into evidence. The commissioners determined that the challenge was invalid and permitted the vote.
A candidate has a right to contest the decision of the commissioners in an election contest, as was done in this case. The evidence shows, very clearly, that the decision of the commissioners was incorrect.
Accordingly, the challenge of the vote of Norman Fillingame is sustained, and his vote is voided as illegal.
Although Mr. Fillingame testified that he voted for Mary Fanara, there is considerable evidence to suggest otherwise, including, specifically, his having told witnesses, who testified, that he voted for, and supported, Mr. Candella.
If it become necessary for any reason, for purposes of appeal or otherwise, the court finds that there is a preponderance of the evidence that he voted for Mr. Candella. It's my opinion that the candidate for whom he voted is not going to be material, based upon further findings, which I will announce later.
Next, we will discuss the vote of Lawrence Thompson. The documentary evidence establishes that on May 7, 1991, Lawrence Thompson pleaded guilty to the offense of SECOND DEGREE BATTERY in the Twelfth Judicial District Court, and he was sentenced to serve an 18 month period of imprisonment with the Department of Corrections. The sentence was suspended, and he was placed on supervised probation for a period of three years. There's no evidence to show any change in that status.
Mr. Lonnie Juneau, Registrar of Voters, testified from the Voter Registration Roles, that Lawrence Thompson voted in Ward 10, Precinct 5, in the March 26, 1994 election.
Although the Voter Registration and Criminal Court records show a different middle name, they both show the same date of birth, February 11, 1967. No evidence was presented to show, or attempt to show, that these are different persons.
It is the finding of the court that there is a preponderance of the evidence that Mr. Lawrence Thompson, who voted in Ward 10, Precinct 5, on March 26, 1994, was not qualified to vote.
On that issue, I would call attention to 18:102, which says:
"No person shall be permitted to register or register or vote, who is under an order of imprisonment."
as defined in RS 18:2(2) for conviction of a felony.
18:2(2) defines the term "Under an order of Imprisonment" as follows:
"Under an order of imprisonment" means a sentence of confinement, whether or not suspended, whether or not the subject of the order has been placed on probation, with or without supervision, and whether or not the subject of the order has been paroled.
The evidence does not indicate that any protest or challenge was made to this vote. And, the issue and it's a very serious issue, becomes whether it can be excluded from the vote total.
On that issue, it is necessary to determine whether the failure to challenge the vote on the day of the election constituted a waiver of his right to object to the vote after the election. To properly evaluate that issue, we should look at the exact language of 18:1434, which relates to Waiver of Objections. And it says:
"An objection to the qualifications of a voter or to an irregularity in the conduct of the election which, with the exercise of due diligence, could have been raised by a challenge of the voter or objections at the polls to the procedure is deemed waived."
*413 The question is whether the failure to challenge was a failure to exercise due diligence. On that point, it is significant that when Lawrence Thompson applied to register to vote on July 26, 1990, he answered the question that he was not under an order of imprisonment. That was presumably correct, because he was not convicted until May 7, 1991. So, why is that important? This means that checking the Voter Registration Rolls would not have shown that Lawrence Thompson was under a sentence of imprisonment. Where does that leave us? The question then becomes whether due diligence requires a candidate to research every registered voter in advance of an election, to determine whether they are under a felony sentence of imprisonment, in order to be prepared to challenge if such a person attempts to vote. And, I might point out that it doesn't necessarily have to be a felony in Louisiana. It could be anywhere. In my opinion, this would be an almost ridiculous requirement.
If there was evidence that Mary Fanara knew that this voter was registered and had a felony sentence, certainly, a valid argument could be made that she should have lodged a formal challenge. There is no such evidence in this case.
It is, therefore, the ruling of the court that the objection to that vote, in this litigation, was not waived, and that there was a preponderance of the evidence to establish that the vote is illegal, and should be deducted from the total vote.
There is no evidence, whatsoever, to show for whom Lawrence Thompson voted, and the only result could be to deduct it from the total.
The court's rulings, with respect to votes of Norman Fillingame and Lawrence Thompson, do not determine the winner of the election, but, they are, nevertheless, discussed for purposes of the record.
There are allegations of irregularities in the conduct of the election relating to claims of illegally hiring transportation of voters to the polls, using police vehicles to transport voters to the polls, promising employment and other things of value in return for votes. Although there was testimony indicating some of those activities may have taken place, they are seriously disputed. And, because of the court's ruling on the issue of "unauthorized assistance of voters," it is not necessary for me to render findings on those issues.
By far, the most significant and the most serious issue, is the alleged illegal voting assistance.
The Louisiana Election Code anticipates problems which may arise with a voter being assisted in casting a vote. The Legislature deemed it important enough to include a detailed provision of law which is RS 18:564, captioned "Assistance in Voting," which provides, in part, as follows:
"A. Voters entitled to assistance. A voter shall not receive assistance in voting, unless he is unable to read or is unable to vote without assistance because of a physical handicap, including blindness."
Subsection D says:
"Prior to receiving assistance under this Section, the voter shall file with the registrar in person or by mail a statement setting forth the necessity and reasons for this assistance, and shall furnish a certificate of a medical doctor or optometrist certifying to the irremedial nature of the physical handicap as proof of disability. The registrar shall indicate such facts on the voter's original application for registration, on the voting certificate, or on other official registration records. Thereafter, the voter shall not be required to present evidence of any kind at the polls."
Subsection D(2) provides:
"A voter shall also be entitled to assistance without having filed with the registrar a statement setting forth the necessity and reasons for this assistance if, on election day, the voter presents to the commissioner-in-charge a physician's certificate indicating the voter's inability to vote without assistance because of a physical handicap. The commissioner-in-charge shall attach this certificate to the precinct register."
So, by way of review, this provision starts off saying, a voter may not receive assistance *414 unless ... and it goes on to discuss what the "unless" is.
The law makes it very clear that a voter is not entitled to assistance unless those requirements are met. The evidence, in this case, indicates, that although the commissioners had been properly instructed as to those requirements, they were not properly enforced in Ward 10, Precinct 4, in the election of March 26, 1994.
Mrs. Hattie Warner, who has been the Clerk of the City Court of Bunkie for many years, was at Precinct 4, as a watcher, designated by Mary Fanara for the March 26, 1994 election. She testified as to violation of the law relating to assistance in voting. The court was impressed by her testimony, and, particularly, the manner in which she documented her complaint about commissioners permitting unauthorized assistance. She testified, very positively. She, personally, observed 27 voters receive assistance by others entering the machine with the voters. She questioned the commissioners on two occasions as to this procedure, at least two; that was my recollection, maybe more. She questioned the commissioners as to this procedure, but this went unheeded, except that as to some of the voters, she was told that a voter was entitled to assistance, because it was the first time the voter was voting.
The testimony, as I said earlier, is somewhat vague as to what was said, and how many times it was said. But, apparently, she quit, after having been told that the procedure was correct.
Registrar of Voters, Lonnie Juneau, testified from the Voter Registration Rolls that 18 of the voters who were listed by Hattie Warner, as having received assistance, were not shown to be entitled to assistance in the records. This means that they did not have pre-election authority to receive assistance under 18:564 D(1). There was no evidence that any of these 18 voters presented a physician's certificate indicating physical handicap at the time they voted under 18:564 D(2). Those are the only provisions permitting assistance.
One of the 18 voters who received assistance without the statutory requirement having been met, was Connie Sue Williams. She was assisted by a commissioner, standing away from a machine, and simply calling out instructions to the voter. This was certainly not improper. That incident will not be considered unauthorized assistance.
With reference to the other 17, however, Hattie Warner was very definite and very convincing, that both, the voter and the helper, were in the booth, behind the curtain, together, when the vote was cast.
The court finds that the evidence clearly establishes serious irregularities in Ward 10, Precinct 4 on March 26, 1994, by the commissioners permitting persons to enter voting machines to assist voters who were not legally entitled to assistance under 18:564.
Neither the statute 18:564, nor any of the case law, hold, specifically, that a violation allows the court to disqualify these votes in an election, or to be taken into account when an election is contested.
It is the defendant's position, and, I certainly understand that position, that unauthorized assistance, as well as the election offenses listed in 18:1461 and 18:1462, while they may be the basis for criminal prosecution, they argue that these cannot serve as a basis to void an election, even if proved. That position is understandable, and is, perhaps, correct.
However, a careful analysis of all of the provisions of the Election Code, leaves this court to conclude otherwise. Should the only possible result of improper or unauthorized activities as listed in 18:564, 18:1461, or 18:1462 be the potential prosecution of the person who violates those laws, should that be the only possible result of those provisions of law? Those provisions should be examined in the light of 18:1401 which authorizes the contest of an election based upon "unlawful activities in the conduct of an election." It appears logical to me, that the unlawful activities mentioned in 18:1401 would necessarily include, though, perhaps, not be limited to the unlawful activities specified in the Election Code. That conclusion by this court may not be necessary to this case, but it is *415 recited in order to make the court's findings as clear as possible.
The next issue is whether the plaintiff is entitled to question those irregularities in this action. The defendant asserts that because she did not formally challenge the voters who received assistance, that she waived the irregularity under the provisions of 18:1434, which I just read in connection with another issue; and there's no reason to read it again. This is a serious issue and should be examined very carefully.
The first issue is whether a formal written challenge under 18:565 is required.
The language of 18:1434 says:
"* * * challenge of the voter or * * *" and I emphasize the word "or,"
".. objections at the polls * * *"
A logical interpretation is that a waiver can be avoided by either a challenge of the voter or objections at the poll.
The other significant language is 18:565, which relates to the challenge of votersthe other significant language is 18:565. This is the provision which requires:
"* * * the formal written challenge, signed by the challenger, placed in the voting machine, and preserved as a part of the election returns * * *"
The important language, in my opinion, of 18:565, for present purposes, is the list of the grounds for challenge. It must be remembered that this law relates to challenge of voters' qualifications, and it does not relate to an irregularity in the conduct of an election.
The only grounds for challenge of a voter, under 18:565 are, and there are three of them:
"(1) The applicant is not qualified to vote in the election,
"(2) The applicant is not qualified to vote in the precinct, or
"(3) The applicant is not the person whose name is shown on the precinct register."
The protest of a voter allegedly receiving unauthorized assistance is not a challenge of voter qualifications, and is not listed as a ground for challenge under 18:565.
By examining 18:1434 and 18:565, together, it can be seen that 18:1434 relates to both, challenge of voters and objections to an irregularity in the conduct of an election, whereas, 18:565 relates only to challenge of voters as to their qualifications to vote.
By way of illustration, if a watcher objects to a voter receiving assistance, and wishes to sign a written challenge, the commissioner should look to 18:565 to see if a challenge can be made on that ground. The answer would be NO, because the protest is not based upon any of the three grounds listed in 18:565. That being the case, it is the opinion of the court that the failure to file a formal written challenge, under 18:565, cannot be a waiver because it is not a grounds for challenge for the unauthorized assistance of a voter.
We should compare this to the discussion of the formal challenge of Norman Fillingame in which the basis of the protest was exactly as set forth in 18:565 A(2), that is that "the applicant is not qualified to vote in the precinct." That falls directly under the language of 18:565. That is a clear illustration of the type protest which is covered by the formal challenge in 18:565.
Having decided that a formal written challenge under 18:565 was not required to the "unauthorized assistance of voters." We should discuss whether Mrs. Hattie Warner, whether her actions constituted an objection at the poll under 18:1434. She testified that she questioned the "unauthorized assistance." And that was the only word she ever used; she "questioned;" she did not use the word "objected."
Irrespective of the designation, her action called for and resulted in a response from the commissioner-in-charge, although the commission-in-charge denied that there ever was even a question raised. I conclude from the evidence that she did, in fact, raise a question. That was also supported by another witness. So, presumably, she must have considered it, if there was a response to it, it must have been considered of a serious nature. The response, you will recall, was that, "it's all right if it's a first time voter;" or, *416 "she's real old, and she needs assistance," which Mrs. Campbell did testify to having said.
Since Mrs. Warner said she "questioned" the "unauthorized assistance in voting." Perhaps, we should consider the meaning of the verb, "question." And, now, we're playing with words. And, of course, a whole lot of the law is playing with words, what do the words mean?
Now, I looked at the verb "question," in Websters Unabridged Dictionary. It lists three definitions of the verb, "question." The first is, to ask questions; to interrogate; to put queries to. The second definition of the verb "question," is, to doubt; to be uncertain of; to have no confidence in; to treat as doubtful. And, the third definition of the verb, "question," is, to challenge; to call in question.
Under one definition of the verb, "question," to question the irregularity, is to challenge it. It is the opinion of this court that the actions taken by Mrs. Hattie Warner, constituted objections at the poll, within the meaning 18:1434.
The final question on this issue is whether the plaintiff waives the right to protest the unauthorized voter assistance in Precinct 4, is whether she exercised due diligence, as those words are used in 18:1434.
In exploring that issue, two facts should be recognized at the outset:
First, there is no requirement to have a watcher at each poll. And, secondly, there is no way a candidate could be expected to know that voters will be given "unauthorized assistance," in any particular precincts.
Let us suppose that the plaintiff did not have a watcher in Precinct 4; and she did not find out about "unauthorized assistance," until after the polls closed. Is the failure of a candidate to have a watcher, a green light for improper activity? Certainly not.
There are several cases holding that the failure of a candidate to challenge a voter at the polls is a waiver of the objection. The court acknowledges that. Each one of those cases has a different factual setting.
There are no cases which fully explore the issue of "due diligence." None of those cases really discuss what is "due diligence."
Although I have held that there was an objection at the polls in this case, in so doing, I am not holding that the failure to have watchers looking for wholesale violations at every precinct, is a failure to exercise due diligence.
This case proves that commissioners do fail, seriously, in some situations. And this court does not feel that a candidate must be prepared for such eventuality at every poll.
In the case of Fontenot v. Lee (Supra), which I cited earlier, the Third Circuit Court of Appeal, and the words of Judge Culpepper, discussed the issue of the necessity to protest at the polls. The defendants in that case argued that under two cited cases, that it would have to have been impossible to have shown an irregularity before, or at the election, in order to base an election contest on that irregularity. In response to that position, the court said, and I quote,
"* * * Neither of these cases are authority for the holding in the present case that all irregularities at the polls on election day must be protested at the polls. Counsel have not cited, nor have we found, any case or statute which supports such a rule. To the contrary, in the recent Supreme Court case of Garrison v. Connick, 291 So2d, 778 (La.1947), the court overruled defendant's exception of no cause of action even though the plaintiff had made no protect before or on election day as to the many votes which were contested."
"This court, in the case of Love v. Cross, [158 So.2d 614 (La.App.1963)] (Supra), indicated that there may be times when the irregularities are such that it would be impossible for the plaintiff to have protested them on election day. * * *"
"It is the finding of the court that the "unauthorized assistance" of 17 voters constituted a violation serious enough to render the outcome of the election impossible to determine, because there is no evidence as to how these voters voted.
Although there is evidence that some of Mr. Candella's campaign workers were the *417 helpers, that evidence certainly does not support a finding that Mr. Candella received any of those votes. That is why I find that the election falls into the category of, and I quote, "impossible to determine the result of the election," under 18:1432, which requires the court to declare the election void and to order another election.
I wish to point out that the evidence does not indicate that Mr. Candella had any part in the commissioners permitting unauthorized assistance in Precinct 4. This does not mean that it cannot be examined examined in determining whether the election may be contested. When irregularities are such that it is impossible to determine the results of an election, a candidate is entitled to the remedy set forth in 18:1432, irrespective of the identity of the parties who caused the irregularities.
ACCORDINGLY, the election of March 26, 1994 for the office of Chief-of-Police of the City of Bunkie, Louisiana is declared void. And a new general election is ordered to be held between Charles J. Candella and Mary Fanara on April 30, 1994.
Since this decision is not based upon any irregularities directly attributable to Mr. Candella, it would be unfair to assess him with all of the costs of court.
AND, ACCORDINGLY, under the authority of Article 1920 of the Louisiana Code of Civil Procedure, the costs in this court will be divided equally between Mary Fanara and Charles J. Candella.
In conclusion, I wish to state that setting aside the results of an election is not an easy thing to do. I have great respect for the electoral system. I wish to make it very clear that I have agonized over this decision, and I would not render such a decision without being thoroughly convinced that it is the fair and proper decision.
I have prepared, and will now sign, a formal judgment in keeping with the decision which I have just announced.

BY THE COURT:
I'd like to call attention to the issues relating to appeal, and the 24 hour requirement with reference to appeal. Tomorrow is Sunday. I think that Monday would be satisfactory. I will do anything I can. I have already prepared the judgment. It will not be necessary for counsel to do that, in the event of an appeal, to make it as easy as possible.
It is the decision of the court.
COURT IS ADJOURNED.